UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEN KARAMON,
d/b/a KARAMON SALES COMPANY,

        Plaintiff,

vs.

Case No. 05-CV-71239
HON. GEORGE CARAM STEEH

VSI AUTOMATION, INC.,

        Defendant.

_____/

<u>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO ELCRA AND CONVERSION CLAIMS (#22);
GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT I ALLEGING LIABILITY UNDER 42 U.S.C. § 1981 (#28);
DISMISSING WITHOUT PREJUDICE PLAINTIFF'S REMAINING
STATE LAW CLAIMS; AND DENYING AS MOOT PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (#23), DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO CONTRACTUAL CONSTRUCTION (#25),
AND DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNTS III AND IV (#26)</u>

Defendant VSI Automation, Inc. moves for summary judgment, in four separate motions for partial summary judgment, as to plaintiff Ken Karamon's claims of race discrimination in violation of 42 U.S.C. § 1981; race discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 <u>et</u> <u>seq</u>., liability under the Michigan Sales Representative Act ("SRA"), M.C.L. § 600.2961, breach of contract, and common law conversion. Plaintiff Karamon moves for partial summary judgment as to his breach of contract claim. A hearing on the motions was held on January 5, 2006.

## I. Background

Plaintiff Ken Karamon, d/b/a Karamon Sales Company, alleges in his First Amended Complaint that he became an independent sales representative for defendant VSI in 1994,

selling automation equipment and screwdrivers. Karamon alleges VSI unilaterally decreased his sales commissions in 1996 through 2004, denied him earned sales commissions, and intentionally concealed sales projects. Karamon specifically alleges that VSI unilaterally changed his sales commission structure in November 2003, taking away certain sales accounts and stating in a November 2003 letter that "Japanese accounts will be handled primarily by Japanese salesmen." Plaintiff alleges he was terminated by VSI as a sales representative on September 1, 2004 after VSI refused to allow him to work on Japanese sales accounts. Count I alleges race discrimination favoring Japanese sales representatives in violation of 42 U.S.C. § 1981. Count II alleges race discrimination in violation of Michigan's ELCRA. Count III alleges violation of Michigan's SRA. Count IV alleges breach of contract. Count V alleges common law conversion[1].

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light

---

[1] The court previously granted defendant's motion for partial summary judgment to the extent Count V alleged a claim of statutory conversion under M.C.L. § 600.2919a, and construed Count V to allege a claim of common law conversion. See September 9, 2005 Order.

most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532. If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## A.  ELCRA and Common Law Conversion

The protections of Michigan's ELCRA extend only to employees and not to independent contractors. See Falls v. The Sporting News Publishing Co., 834 F.2d 611, 613 (6th Cir. 1987). Karamon concedes that he was not a VSI employee, and asserts the ELCRA claim was withdrawn in Michigan's Oakland County Circuit before "the parties agreed to dismiss that [state] action and bring all claims in the federal action via a First Amended Complaint[.]" Plaintiff's December 7, 2005 Response Brief, at 2 n.1. VSI is entitled to summary judgment of Karamon's ELCRA claim as a matter of law. Redding, 241 F.3d at 532; Falls, 834 F.2d at 613.

As stated in the court's prior September 9, 2005 Order, a claim of common law conversion of money is actionable in Michigan only if the defendant had an obligation to return specific money entrusted to the defendant's care. Head v. Phillips Camper Sales and Rental, Inc., 234 Mich. App. 94, 111, 593 N.W.2d 595 (1999). Karamon has not proffered argument or evidence that VSI customers paid his commissions into a specific

account payable to Karamon, or that VSI maintained a specific account in Karamon's name, made commission deposits into that account, and later withdrew funds from such an account without Karamon's permission. See Head, 234 Mich. App. at 112, 112 n.3; Check Reporting Services, Inc. v. Michigan National Bank-Lansing, 191 Mich. App. 614, 626, 478 N.W.2d 893 (1992). VSI is entitled to summary judgment of Karamon's claim of common law conversion as a matter of law.[2] Redding, 241 F.3d at 532; Head, 234 Mich. App. at 111.

### B. 42 U.S.C. § 1981

VSI is a Michigan corporation and wholly owned subsidiary of Nitto Seiko Company Limited, a Japanese corporation. Toyo Seat, a "Japanese Transplant Company," was an exclusive customer of Karamon until VSI and Karamon executed a November 26, 2003 Sales Representation Agreement, which provides in part:

> **2. NON-EXCLUSIVE**
>
> This contract is being issued as a totally non-exclusive agreement for [Karamon] to work this territory. Any sales credited to [Karamon] must be originated by the representative by way of an application writeup form. There may be other applications arising in the territory and submitted to VSI by other representatives for which they will be credited. At the discretion of the regional sales manager, any VSI generated leads will be handled by VSI or forwarded to the territory after evaluation of effort by the representative to obtain their semi-annual goals. In order to be awarded exclusivity, all goals must be obtained for a period of one year.
>
> \*   \*   \*
>
> **4. NON-EXCLUSIVE ITEMS**

---

[2] In response to VSI's motion for partial summary judgment, Karamon argues that conversion is actionable as a separate tort claim independent of his breach of contract claim. While the argument has merit, Karamon has not shown that the commissions he seeks were held in specific accounts payable to Karamon. Karamon's further argument that he may recover under equitable theories of unjust enrichment and quantum meruit is irrelevant with respect to his tort claim of conversion. Karamon has not alleged an equitable claim of unjust enrichment or quantum meruit in his First Amended Complaint.

4

> VSI is continually engaged in handling direct customer inquiries as a result of direct shows and existing customers. When representative coverage is available, it is our policy to refer these to your firm for followup and sales.
>
> The following conditions will apply for these items:
>
> \*   \*   \*
>
> > **Japanese Transplant Companies.** These companies will be the direct responsibility of VSI. You are encouraged to contact these customers and may be asked by VSI to handle direct. If no effort is put forth to cultivate these customers, credit will not be issued to your firm.
>
> However, VSI Automation may call upon your company to assist in the sale of the above products. In such cases, your company will submit an application write-up and, if approved by your regional manager, your company will be credited if sales results. In no instance will VSI Automation be liable for a sales commission on non-exclusive items without this written agreement.

VSI Director of Marketing & Sales Bob Mineau also delivered a November 26, 2003 letter to Karamon, which reads in part:

> VSI is revising our sales and marketing for the Michigan area which is going to affect Karamon Sales company. Internally, Mike Bernard has responsibility for GM Truck and Delphi; Paul Camilleri will continue with his current territory, but will not handle Southeast Michigan. Our regional sales managers will also be directed to obtain more American company applications and orders. <u>Japanese accounts will be handled primarily by Japanese salesman</u> [sic]. Project engineers will be involved with handling house accounts in which salesmen are not required.
>
> Effective 11/26/03, VSI Automation will be retaining your services on a non-exclusive basis in Michigan. <u>VSI will be creating Toyo Seat, Delphi and General Motors as house accounts</u>.

(emphasis added). A copy of the letter was forwarded to then VSI President and General Manager Shoji Otuski.

Karamon alleges VSI's preference for Japanese salesmen as expressed in the November 26, 2003 letter constitutes unlawful interference with his exclusive sales

representative contract on the basis of race, in violation of 42 U.S.C. § 1981[3]. Karamon is Caucasian. In opposing VSI's motion for summary judgment of his § 1981 claim, Karamon proffers the deposition testimony of then VSI Sales Manager Paul Camilleri, and VSI Engineers William Mount and Dale Long, as demonstrating that VSI President Otsuki preferred Japanese salespersons, and treated Japanese employees better than other employees. Plaintiff himself testified that Otsuki told him that he "felt Japanese people were better than Americans," and that "[w]e were not as skilled, not as organized, not as, I was told, not as efficient. So they preferred to handle it themselves." Karamon August 4, 2005 Deposition Transcript, at 60-61. VSI responds that the record evidence supports only a finding of national origin discrimination, which is not actionable under 42 U.S.C. § 1981.

A § 1981 race discrimination claim may be proven by direct evidence, or indirect circumstantial evidence under the well-known analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1993). <u>See</u> <u>Mitchell v. Toledo Hospital</u>, 964 F.2d 577, 582, 582 n.4

---

[3] "**(a) Statement of equal rights**
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
**(b) 'Make and enforce contracts' defined**
For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
**(c) Protection against impairment**
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

(6th Cir. 1992). Direct evidence is evidence, which if believed, requires the conclusion that the defendant was unlawfully motivated in its actions. See Mitchell v. Vanderbilt University, 389 F.3d 177, 181 (6th Cir. 2004) (citing McDonnell Douglas, 411 U.S. 792). In using indirect evidence, the plaintiff is initially required to establish a prima facie case that: (1) he is a member of a protected class; (2) he was qualified for the position; and (3) he was treated differently than a similarly situated person outside the class. Mitchell, 964 F.2d at 582-583. If this burden is met, a rebuttable presumption of unlawful discrimination arises, requiring the defendant to articulate a legitimate reason for its conduct. Anthony v. BTR Automotive Sealing Systems, Inc., 339 F.3d 506, 515 (6th Cir. 2003). If the defendant meets this burden of evidentiary production, the plaintiff must prove that the defendant's proffered reasons are merely a pretext for discrimination. Id. at 515.

Plaintiff, as an alleged Caucasian, is clearly a member of a protected class for purposes of pursuing a § 1981 claim. Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987) (citing McDonald v. Sante Fe Trail Transportation, 472 U.S. 273 (1976)). In rejecting the argument that § 1981 does not encompass claims by one Caucasian against another Caucasian, the Court rejected the concept for purposes of § 1981 litigation that there are only three major human races: Caucasoid, Mongoloid, and Negroid. Saint Francis, 481 U.S. at 609-610, 610 n.4. The Court reasoned that historical context did "not support the claim that for the purposes of § 1981, Arabs, Englishmen, Germans, and certain other ethnic groups are to be considered a single race." Id. at 612. Holding that an Iraqi professor of Arabian ancestry could maintain a § 1981 race discrimination claim against a college based on a denial of tenure, the Court summarized:

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it

7

> would be classified as racial in terms of modern scientific theory. The Court of Appeals was thus quite right in holding that § 1981, "at a minimum," reaches discrimination against an individual "because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens." It is clear from our holding, however, that a distinctive physiognomy is not essential to qualify for § 1981 protection. If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, <u>rather than solely on the place or nation of his origin</u>, or his religion, he will have made out a case under § 1981.

<u>Id</u>. at 613 (emphasis added). It has thus now well established in this Circuit that a § 1981 claim based on national origin discrimination, as opposed to race discrimination, is not actionable. <u>Amini v. Oberlin College</u>, 259 F.3d 493, 502 (6th Cir. 2001) (citing <u>Saint Francis Coll.</u>, 481 U.S. at 613 for the proposition that "only claims of racial, as opposed to national origin, discrimination are cognizable under § 1981"); <u>Ana Leon T. v. Federal Reserve Bank of Chicago</u>, 823 F.2d 928, 931 (6th Cir. 1987) (citing <u>Saint Francis Coll.</u>, 481 U.S. at 613 for the proposition that while "[i]t is well settled that § 1981 redresses only racial discrimination . . . the Supreme Court recently held that the racial discrimination prohibited by § 1981 includes intentional discrimination based solely on 'ancestry or ethnic characteristics'").

While Karamon, as a Caucasian, is afforded protection under § 1981 against race discrimination favoring persons outside Karamon's protected class, including Caucasian persons of different ancestry or ethnic characteristics, Karamon is not afforded protection under § 1981 against national origin discrimination regardless of the persons' race. As explained in <u>Van Abrahams v. Pioneer Electronics U.S.A., Inc.</u>, 1989 WL 225579, *3 (C.D. Cal. June 21, 1989):

> Plaintiff contends that he was discriminated against on the basis of his American citizenship because defendants replaced him, without good cause, with personnel of Japanese citizenship. Under plaintiff's theory, however, Japanese-Americans would be discriminated against as well as Anglo-Americans, Mexican-Americans, etc. Thus, plaintiff's complaint cannot be construed as containing a racial component--citizenship alone is not sufficiently indicative of race to satisfy the legal requirements of a § 1981

claim.

Unlike the procedural posture of Van Abrahams, Amini, and Ana Leon T., each adjudicating Rule 12(b)(6) motions to dismiss for failure to state a § 1981 claim on which relief could be granted, Karamon is faced with a motion for summary judgment under Rule 56. Karamon may not simply rely on his allegations of race discrimination as set forth in his First Amended Complaint, but must come forward with evidence of specific facts on which a jury could reasonably find that VSI was motivated by Karamon's race, as opposed to Karamon's national origin, when it changed Karamon's sales representative status with Toyo Seat from an exclusive relationship to a non-exclusive relationship. Anderson, 477 U.S. at 248, 252; First Nat'l Bank, 391 U.S. at 270; McLean, 224 F.3d at 800; Saint Francis Coll., 481 U.S. at 613; Amini, 259 F.3d at 502; Ana Leon, 823 F.2d at 931. Karamon has failed to meet that burden.

Karamon testified:

Q. Did you have any understanding in '94 or '95 or '97 why it was that VSI wanted to maintain direct responsibility for Japanese transplant companies?

A. [by Karamon] I believe there was a bias there that they could do a better job than we could.

Q. Why?

A. Because they're Japanese.

Q. So your understanding was that VSI, as maybe a transplant company itself, was better, they were better equipped to handle other transplant companies?

A. <u>They felt Japanese people were better than Americans</u>.

Q. To handle their sales or in general?

A. To handle the Japanese accounts. There was a bias from day one that Japanese were better. <u>We were not as skilled, not as organized, not as, I was told, not as efficient</u>. So they preferred to handle it themselves.

Q. Who told you this?

9

> A. Amongst other people, Mr. Otsuki.
>
> Q. Are you aware if VSI ever hired Japanese sales persons?
>
> A. Well, their president, Mr. Otsuki and Mr. Arima before him acted as salesmen. They were just -- just like at Prenco, I was top officer of the company but I was also the top salesman.
>
> Q. Okay.
>
> \*   \*   \*
>
> Q. Were any of the in-house regional sales managers Japanese?
>
> A. No.

Karamon August 4, 2005 Deposition Transcript, at 61-62. Karamon clearly refers to his protected class, "we," as being "Americans," a class that necessarily includes "Japanese-Americans." See Van Abrahams, 1989 WL 225579 at *3. Karamon's recent December 12, 2005 affidavit is ineffective to the extent it attempts to contradict Karamon's August 4, 2005 deposition testimony that VSI was engaging in national origin discrimination. See Reid v. Sears, Roebuck and Company, 790 F.2d 453, 460 (6th Cir. 1986). Otsuki's and Arima's asserted service as in-house VSI salespersons does not support an inference of race discrimination in the absence of evidence that Otsuki and Arima are Japanese-Americans.

The proffered testimony of VSI's Camilleri, Mount, and Long likewise supports only an inference of national origin discrimination. Camilleri testified that he observed "big differences" in the way Otsuki treated "Americans such as [himself] and Karamon as opposed to how well he treated fellow Japanese." Camilleri October 11, 2005 Deposition Transcript, at 46. Camilleri stated "I probably would view that the treatment of the Japanese at VSI was better through [Otsuki] than it was with the Americans." Id. at 47. Camilleri observed Otsuki scowl at "Americans" but do not see Otsuki scowl at Japanese employees in a similar manner. Id. at 48. Camilleri's deposition consistently describes

Otsuki's disparate treatment of Americans. VSI Engineer Mount testified as to his belief that he didn't think "the Japanese" disliked Americans, he believed the Japanese disliked "America" itself. William Mount September 8, 2005 Deposition Transcript, at 14-15. VSI Engineer Long explained that Mineau's November 26, 2003 letter, informing Karamon that "Japanese accounts will be handled primarily by Japanese sales[men]," was pretty much always standard policy at VSI:

> Q. Why is that?
>
> A. Because many of these people don't speak English well, and they like to communicate among other Japanese engineers. It's a comfort level. They're visiting <u>our county</u>.

Dale Long September 8, 2005 Deposition Transcript, at 29 (emphasis added). Long continued that "[i]t is normal for any Japanese to exclude Americans in their business lunch or dinner." <u>Id</u>.

Construing the record evidence in a light most favorable to Karamon, a reasonable jury could not find that VSI discriminated against Karamon based on his Caucasian race. At best, Karamon has proffered evidence of national origin discrimination, a claim that is not actionable under 42 U.S.C. § 1981 as a matter of law. <u>Saint Francis Coll.</u>, 481 U.S. at 613; <u>Amini</u>, 259 F.3d at 502; <u>Ana Leon</u>, 823 F.2d at 931; <u>Van Abrahams</u>, 1989 WL 225579, at *3. Mineau's November 26, 2003 letter stating "Japanese accounts will be handled primarily by Japanese salesman [sic]" does not constitute direct evidence of race discrimination because it does not support a jury inference that VSI discriminated on the basis of race as opposed to national origin. See <u>Mitchell</u>, 389 F.3d at 181. Coupled with the remainder of Karamon's proffered indirect evidence, a reasonable jury could not conclude that VSI engaged in actionable race discrimination. <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587; <u>First Nat'l Bank</u>, 391 U.S. at 270; <u>Redding</u>, 241 F.3d at 532; <u>McLean</u>, 224 F.3d at 800. VSI is entitled to summary judgment of Karamon's § 1981 claims as Karamon

cannot prove a prima facie case that he was discriminated against on the basis of his Caucasian race as opposed to his American national origin. Id.; Mitchell, 964 F.3d at 582-583; Anthony, 339 F.3d at 515. In that Karamon has failed to establish a prima facie case, the court need not proceed to a pretext analysis.

### C. Michigan SRA and Breach of Contract Claims

Karamon's remaining claims are state law claims alleging statutory liability under Michigan's SRA and breach of contract, in Counts III and IV respectively. A district court may decline to exercise supplemental jurisdiction over state law claims if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). As reasoned herein, VSI is entitled to summary judgment of Karamon's federal 42 U.S.C. § 1981 claim over which the court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

> "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1254 (6th Cir.1996) (citation omitted). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." Id. at 1254-55 (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)); see also Brandenburg v. Housing Authority of Irvine, 253 F.3d 891, 890 (6th Cir.2001) ("In fact, the usual course is for the district court to dismiss state-law claims without prejudice if all federal claims are disposed of on summary judgment."); Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1412 (6th Cir.1991) (noting that only "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial").

Andonian v. Autoalliance International, Inc., No. 01-CV-73918-DT, 2003 WL 2010745, at *18 (Feb. 25, 2003). Pursuant to 28 U.S.C. § 1367(c)(3), and consistent with Andonian and the authority cited therein, the court will exercise its discretion and dismiss Karamon's remaining state law claims of liability under the SRA and breach of contract, to be pursued in Michigan's Oakland County Circuit Court as originally filed by Karamon. The parties do agree that there is no diversity of citizenship. The parties' motions and cross-motion for

12

summary judgment as to the remaining state law claims will be denied as moot.

### III. Conclusion

For the reasons set forth above, VSI's motion for partial summary judgment as to Karamon's ELCRA and common law conversion claims is hereby GRANTED. VSI's motion for partial summary judgment of Karamon's 42 U.S.C. § 1981 claim is also hereby GRANTED. Plaintiff Karamon's claims of race discrimination under § 1981 as alleged in Count I, race discrimination under the Michigan ELCRA claim as alleged in Count II, and common law conversion as alleged in Count V, are hereby DISMISSED with prejudice. Karamon's remaining claims of liability under Michigan's SRA as alleged in Count III, and breach of contract as alleged in Count IV, are hereby DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3). Plaintiff Karamon's motion for partial summary judgment with respect to his breach of contract claim, and VSI's motions for partial summary judgment as to contractual construction and Karamon's claims as alleged in Counts III and IV, are hereby DENIED as MOOT.

SO ORDERED.

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated: January 31, 2006

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on January 31, 2006, by electronic and/or ordinary mail.

s/Josephine Chaffee
Secretary/Deputy Clerk